**INTERNATIONAL MINERALS AND CHEMICAL CORPORATION,**
Appellee,

v.

**M.K. Heidi HEITKAMP, Tax Commissioner of the State of North Dakota, Appellant.**

Civ. No. 11416.

Supreme Court of North Dakota.

Dec. 29, 1987.

Pearce & Durick, for appellee; argued by William P. Pearce.

Albert R. Hausauer, Asst. Atty. Gen., Bismarck, for appellant.

Harold L. Anderson, Bismarck, and Jean A. Walker, Washington, D.C., for amicus curiae Committee on State Taxation of the Council of State Chambers of Commerce.

Eugene F. Corrigan, Boulder, Colo., for amicus curiae Multistate Tax Comn.

MESCHKE, Justice.

The State Tax Commissioner assessed $111,389 in additional North Dakota corporate income and business privilege taxes, interest, and penalties against International Minerals & Chemical Corporation [IMC]

for fiscal years ending June 1978 through June 1983. On appeal of the administrative decision, the district court reversed the Commissioner's assessment. The Commissioner seeks further review of two issues: 1) can IMC deduct "mileage credits," paid by rail carriers to IMC as a shipper supplying its own railroad cars for transporting its products, in determining the "net annual rental rate" of leased cars capitalized for computing IMC's property factor for apportioning its taxable income to North Dakota under the Uniform Division of Income for Tax Purposes Act [UDITPA], Chapter 57–38.1, N.D.C.C.; and 2) can IMC constitutionally exclude the amount of its foreign dividend "gross-up" required for federal income tax purposes from its taxable income before apportionment to North Dakota. We hold that IMC cannot deduct mileage credits and cannot exclude the foreign dividend "gross-up." Therefore, we reverse.

The facts are undisputed. Inasmuch as only questions of law are involved, the Commissioner's decision is fully reviewable by this court. *Grant Farmers Mutual v. State by Conrad*, 347 N.W.2d 324, 327 (N.D.1984).

### I. *Mileage Credits*

IMC produces fertilizers and chemicals which it distributes throughout the United States and several foreign countries. IMC ships some of its products by rail. For part of its rail shipments, IMC leases or purchases its own railroad cars, which are then hauled by the rail carriers. IMC has a fleet of 600 private railroad cars and leases

an additional 2,500 railroad cars from private carline companies. IMC leases railroad cars two ways: Under a "full service lease," the owner is responsible for all maintenance and upkeep, while under a "net lease" IMC has this responsibility.

Rail carriers must compensate shippers, such as IMC, who supply the freight cars to transport their products. *See* 49 U.S.C. § 11122.[1] This compensation by the rail carrier to the shipper, based upon the number of "loaded miles" the furnished cars travel, is termed a "mileage credit." The rail carrier pays the mileage credit on a net lease to IMC and, on a full service lease, to the railroad car owner, but the credit on a full service lease is then passed on to IMC by the railroad car owner as a credit against the rental charges paid by IMC. Thus, under either lease plan, IMC benefits because the mileage credits offset costs of leasing and shipping.

Because IMC conducts its business within and without North Dakota, its business income is apportioned to this state by using the three-factor formula (property, payroll, and sales) prescribed in UDITPA, Chapter 57–38.1, N.D.C.C. The property factor is computed by dividing the average value of real and tangible property owned and rented by the taxpayer in this state during the tax year by the average value of all real and tangible property owned and rented by the taxpayer during the tax year. § 57–38.1–10, N.D.C.C. Section 57–38.1–11, N.D.C.C., spells out the property valuation method:

> *"Property owned and rented.* Property owned by the taxpayer is valued at its

---

1. 49 U.S.C. § 11122 provides:

   "§ 11122. *Compensation and practice*

   "*(a)* The regulations of the Interstate Commerce Commission on car service shall encourage the purchase, acquisition, and efficient use of freight cars. The regulations may include—

   "*(1)* the compensation to be paid for the use of a locomotive, freight car, or other vehicle;

   "*(2)* the other terms of any arrangement for the use by a rail carrier of a locomotive, freight car, or other vehicle not owned by the rail carrier using the locomotive, freight car, or other vehicle, whether or not owned by another carrier, shipper, or third person; and

   "*(3)* sanctions for nonobservance.

   "*(b)* The rate of compensation to be paid for each type of freight car shall be determined by the expense of owning and maintaining that type of freight car, including a fair return on its cost giving consideration to current costs of capital, repairs, materials, parts, and labor. In determining the rate of compensation, the Commission shall consider the transportation use of each type of freight car, the national level of ownership of each type of freight car, and other factors that affect the adequacy of the national freight car supply."

original cost. Property rented by the taxpayer is valued at eight times the net annual rental rate. Net annual rental rate is the annual rental rate paid by the taxpayer less any annual rental rate received by the taxpayer from subrentals."

This "mileage credit" issue concerns valuation of leased cars for the property factor. In valuing leased cars for its property factor, IMC deducted mileage credits from the annual rentals paid before capitalizing at eight times the "net annual rental rate." The Commissioner disallowed the deduction for mileage credits. The district court upheld IMC's method of computation, concluding that mileage credits were deductible "subrentals" under the statute.[2]

In this court, IMC concedes that the mileage credits are not "subrentals" within the meaning of § 57–38.1–11, N.D.C.C. We agree.

The word "subrental" is not defined in Chapter 57–38.1, N.D.C.C., and we must therefore look to its commonly understood meaning. Section 1–02–02, N.D.C.C.; *Wills v. Schroeder Aviation, Inc.,* 390 N.W.2d 544, 545–546 (N.D.1986). "Subrent" is "rent from a subtenant." Webster's Third New International Dictionary 2278 (1971). A "subtenant" is "one who leases all or a part of the rented premises from the original lessee for a term less than that held by the latter." Black's Law Dictionary 1282 (5th ed. 1979). Thus, under the statute, subrentals are the payments a subtenant makes to the original lessee.

The mileage credits paid by rail carriers do not fit this definition. IMC does not sublease the railroad cars to the rail carriers. Rather, third parties lease the cars to IMC which, in turn, pays the rail carriers to haul the cars to transport IMC products. The mileage credits are not paid pursuant to any sublease agreement, but are a carrier's rebates to a shipper mandated by federal law. Thus, the mileage credits are not subrentals.

IMC asserts that the mileage credits can nevertheless be deducted because they reduce IMC's cost of leasing a railroad car and because the "net annual rental rate" under § 57–38.1–11, N.D.C.C., must be its net monetary cost. It is the actual rental expense, rather than the gross rental rate, that IMC uses to determine whether to enter into a particular lease with a carline company, and thus, IMC contends, it is the appropriate amount to be capitalized to determine the value of a car. IMC relies upon decisions from other jurisdictions, none of which were decided under the UDITPA property factor provision, for the propositions that capitalization of rentals is an accepted method for valuation of leased property, and that it is always *net* rentals that are to be capitalized.

■ We might agree with IMC's argument if the term "net annual rental rate" was not defined by the statute. For Chapter 57–38.1, however, "net annual rental rate" means "the annual rental rate paid by the taxpayer less any annual rental rate received by the taxpayer from subrentals." § 57–38.1–11, N.D.C.C. A statutory definition which declares what a term means excludes any meaning that is not stated. 2A *Sutherland Statutory Construction* § 47.07 at p. 133 (4th ed. 1984); *Hermanson v. Morrell,* 252 N.W.2d 884, 888 (N.D. 1977); and § 1–02–03, N.D.C.C. It is thus apparent that the term "net annual rental rate" is not used in its ordinary sense and that the statute does not equate value for property factor purposes with actual value of the property to the taxpayer. As the drafters of UDITPA observed:

"This section is admittedly arbitrary in using original cost rather than depreciated cost, and in valuing rented property as eight times the annual rental. This approach is justified because the act does

---

2. In so concluding, the district court invalidated as being in conflict with § 57–38.1–11, N.D.C.C., a part of § 81–03–09–20, N.D.Adm.Code, which provides that "[s]ubrents are not deducted when

the subrents constitute business income...." Because of our disposition of the mileage credit issue, it is unnecessary for us to address the validity of this regulation.

not impose a tax, nor prescribe the depreciation allowable in computing the tax, but merely provides a basis for division of the taxable income among the several states.... No method of valuing the property would probably be universally acceptable."

Comment to § 11, Uniform Division of Income for Tax Purposes Act, 7A U.L.A. 331, 350 (1985).

■ Under the statutory definition, only subrentals may be deducted from the annual rental rate to arrive at the net annual rental rate capitalized for property factor purposes. Because mileage credits required by law to be paid by rail carriers are not subrentals, we agree with the Commissioner that IMC cannot deduct mileage credits in calculating its net annual rental rate of leased railroad cars capitalized for computing the value of its property for use as one factor to apportion its business income for state taxation.

## II.  *Foreign Dividend "Gross–Up"*

■ In computing its federal income tax liability, a corporate taxpayer which pays income tax to a foreign country may either deduct the tax paid to the foreign country under I.R.C. § 164(a)(3) or credit that amount under I.R.C. § 901 against its tax liability. While § 901 provides a credit for foreign taxes a corporation actually paid, I.R.C. § 902 additionally allows a domestic corporation, owning at least ten percent of the voting stock of a foreign subsidiary from which it receives a dividend, a derivative credit for the foreign income taxes paid by its foreign subsidiary on its accumulated profits. In effect, under § 902 the domestic corporation is "deemed" to have paid a portion of the foreign taxes actually paid or accrued by the foreign subsidiary. *See* B. Bittker and J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 17.11 (4th ed. 1979); 34 Am.Jur.2d *Federal Taxation* ¶ 8412 (1987).

If a corporate taxpayer elects to take the § 902 "deemed paid" foreign tax credit rather than the deduction, I.R.C. § 78 requires that the domestic corporation add to its gross income the amount of the "deemed paid" foreign taxes. This amount, commonly referred to as "gross-up," is treated under § 78 as a "dividend" received by the domestic corporation from the foreign subsidiary. *See* B. Bittker and J. Eustice, *supra.*

The purpose of the "gross-up" provision was to eliminate "an unjustified tax advantage" for domestic corporations choosing to conduct foreign business through the use of subsidiaries rather than unincorporated branches. S.Rep. No. 1881, 87th Cong.2d Sess., *reprinted in* 1962 U.S.Code Cong. & Ad.News 3304, 3368. Prior to Congress's adoption of § 78, a domestic corporation, in effect, received both a deduction and a credit for its foreign subsidiary's foreign taxes because they served the dual function of reducing the amount of dividend taxable to the parent corporation and of constituting a credit against the parent's federal taxes on that dividend. *See* B. Bittker and J. Eustice, *supra.* The effect of § 78 was to increase the overall tax rate on foreign dividend income received by a domestic corporation and to more closely equalize the tax burden on the use of subsidiaries and branches. *See* B. Bittker and J. Eustice, *supra;* S.Rep. No. 1881, *supra.* Nevertheless, it generally remains more advantageous for a domestic corporation to elect the "deemed paid" foreign tax credit than to take a deduction since a deduction from income serves only to cut taxable income while the credit reduces dollar for dollar the actual federal tax due. *See* 34 Am.Jur.2d *Federal Taxation* ¶ 8419 (1987).

During the years involved here, IMC received dividends from foreign subsidiaries that paid foreign taxes. IMC elected to take the federal "deemed paid" foreign tax credit and therefore was required to include the "gross-up" amount in its income for federal tax purposes. Under North Dakota law, federal taxable income is the simplified starting point for computing state income tax. *See* §§ 57–38–01(8) and

57–38–01.1, N.D.C.C.; *Erdle v. Dorgan*, 300 N.W.2d 834, 837 (N.D.1980). IMC, however, excluded the "gross-up" amount from its apportionable income on its state tax returns. The Commissioner disallowed this exclusion because North Dakota's income tax statutes do not expressly allow corporations a deduction for taxes paid to a foreign country.[3] The district court upheld IMC's exclusion of the "gross-up", concluding that "North Dakota cannot constitutionally require a U.S. corporation to include as 'income' ... foreign taxes paid by a foreign subsidiary."

IMC asserts that *F.W. Woolworth Co. v. Taxation and Revenue Department of New Mexico*, 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982), holds a state cannot constitutionally tax the foreign dividend "gross-up." *F.W. Woolworth Co.* held that New Mexico lacked power under the due process clause to tax actual dividends Woolworth received from four of its foreign subsidiaries because Woolworth and its subsidiaries were not engaged in a unitary business relationship. The Court found insufficient evidence of the three " 'factors of profitability' arising 'from the operation of the business as a whole' " which "evidence the operation of a unitary business": " 'functional integration, centralization of management, and economies of scale.' " *F.W. Woolworth Co., supra*, 458 U.S. at 364, 102 S.Ct. at 3135, 73 L.Ed. 2d at 828 [quoting *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 438, 100 S.Ct. 1223, 1232, 63 L.Ed.2d 510, 521 (1980) ]. About foreign dividend "gross-up" amounts which New Mexico had also sought to include in Woolworth's apportionable tax base, the Court said:

"We need not be detained by New Mexico's reaching out to tax 'gross-up' amounts that even the Supreme Court of New Mexico recognized as 'fictitious.' ... The gross-up computation is a figure that the Federal Government 'deems' Woolworth to have received for purposes of part of Woolworth's federal foreign tax credit calculation.... In this case the foreign tax credit arose from the taxation by foreign nations of Woolworth foreign subsidiaries that had no unitary business relationship with New Mexico. New Mexico's effort to tax this income 'deemed received'—with respect to which New Mexico contributed nothing—also must be held to contravene the Due Process Clause." *F.W. Woolworth Co., supra*, 458 U.S. at 372–373, 102 S.Ct. at 3139, 73 L.Ed.2d at 833 (Footnote omitted.)

*F.W. Woolworth Co.* is not controlling here. The Supreme Court did not hold that it is always unconstitutional for a state to tax "gross-up" dividends, but only that a state could not tax "gross-up" dividends, just as it could not tax actual dividends, where the foreign subsidiaries had no unitary business relationship with the state. That is not the situation here. IMC does not contest the State's taxation of actual dividends it received from foreign subsidiaries and concedes that its foreign subsidiaries had a unitary business relationship with the State.

IMC claims that it makes no difference whether a unitary business relationship exists, because "it is the fictitious character of the gross-up which offends due process." IMC also contends that if the

---

**3.** At one time § 57–38–01.3(1)(c), N.D.C.C., allowed the taxable income of a corporation to be:

"c. Reduced by the amount of federal income taxes, but not social security and self-employment taxes, plus income taxes of foreign countries, paid or accrued as the case may be during the applicable tax year, adjusted by any federal or foreign tax refunds, to the extent that such taxes were paid or accrued upon income which becomes a part of the North Dakota taxable income."

The deduction for foreign income taxes was repealed by the Legislature in 1975. *See* 1975 N.D.Sess.Laws Ch. 535 § 1. *See also* 1979 N.D. Sess.Laws Ch. 605 § 1 (amending § 57–38–01.3(1)(d) to require that a corporation's taxable income be "[i]ncreased by the amount of any income taxes, including income taxes of foreign countries, or franchise or privilege taxes measured by income, to the extent that such taxes were deducted to determine federal taxable income.")

"gross-up" income is taxed by the state, some offsetting adjustment is needed to correct an "unconstitutional distortion" caused by inclusion of the "gross-up" income without recognizing the amount of foreign taxes paid.

We cannot accept IMC's argument that inclusion of the "gross-up" amount, without recognizing an offsetting adjustment for state tax purposes, is a violation of IMC's due process rights. Several courts, although not directly deciding the question on constitutional due process grounds, have recognized that a state may require corporations to include "gross-up" income without any offsetting adjustments in calculating state tax liability. *See Ex Parte Kimberly–Clark Corp.*, 503 So.2d 304 (Ala. 1987); *Caterpillar Tractor Co. v. Lenckos*, 77 Ill.App.3d 90, 395 N.E.2d 1167 (1979), *aff'd*, 84 Ill.2d 102, 49 Ill.Dec. 329, 417 N.E.2d 1343 (1981), *appeal dismissed sub nom. Chicago Bridge & Iron Company v. Caterpillar Tractor Company*, 463 U.S. 1220, 103 S.Ct. 3562, 77 L.Ed.2d 1402 (1983); *Comptroller v. NCR Corp.*, 71 Md. App. 116, 524 A.2d 93 (1987), *cert. granted*, 310 Md. 275, 528 A.2d 1287 (1987).[4] A domestic corporation required to compute "gross-up" income under § 78 has received economic benefit from its election to take the § 902 foreign tax credit. By making this voluntary election, IMC has reduced its federal income tax liability. While § 78 was enacted for § 902 foreign tax credit purposes, "[i]t should be noted that § 78 dividends constitute 'gross income' for all purposes, not merely the computation of the shareholder's foreign tax credits; thus, unfavorable collateral effects under [other sections of the Internal Revenue Code] can be created by the gross-up rules of § 78." B. Bittker & J. Eustice, *supra*, at p. 17–36 n. 85; *see also* 34 Am.Jur.2d *Federal Taxation* ¶ 8414, at p. 1021 (1987) [" 'gross-up' income is treated as a dividend for all U.S. tax purposes *except* the dividends received deduction." (Emphasis in original.) ]

In this case, it is conceded that IMC's foreign subsidiaries had a unitary business relationship with IMC and North Dakota. Therefore, the due process clause does not preclude North Dakota from taxing actual dividends IMC received from its foreign subsidiaries. *See F.W. Woolworth Co., supra; Mobil Oil Corp., supra.* Having elected the benefit of the § 902 "deemed paid" foreign tax credit, IMC in effect chose not to deduct the foreign taxes paid by its foreign subsidiaries but to instead treat them as "dividends" and therefore "gross income" for purposes of the Internal Revenue Code. We do not believe due process requires that IMC be freed from this choice for state tax purposes. "The propriety of a deduction does not turn upon general equitable considerations ... [but] 'depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed.' " *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974) [quoting *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934) ]. Because North Dakota does not statutorily recognize a deduction for § 78 "gross-up" income, IMC may not exclude the "gross-up" from the amount of federal taxable income reported on its state income tax return.

Accordingly, the judgment of the district court is reversed.

ERICKSTAD, C.J., and LEVINE and GIERKE, JJ., concur.

VANDE WALLE, J., concurs in result.

---

**4.** Other courts have recognized that "gross-up" income is "income" for state tax purposes, but concluded that the "gross-up" amount was deductible as a dividend pursuant to state statutes. *See Dow Chemical Co. v. Commissioner of Revenue*, 378 Mass. 254, 391 N.E.2d 253 (1979); *Commonwealth v. Emhart Corporation*, 443 Pa. 397, 278 A.2d 916, *cert. denied*, 404 U.S. 981, 92 S.Ct. 451, 30 L.Ed.2d 364 (1971).